[No. S012032. Dec. 22, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT GREEN FAIRBANK, JR., Defendant and Appellant.

1228

1230

## COUNSEL

Robert Navarro, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Joan Killeen and Ann K. Jensen, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

CHIN, J.—Defendant tortured Wendy Cheek and then killed her. A week earlier, he had sexually assaulted a different woman. Defendant pleaded guilty to first degree murder and admitted the special circumstances of attempted oral copulation and torture. After a penalty trial, the jury returned a verdict of death. We affirm.

### FACTS AND PROCEDURAL BACKGROUND

The information filed April 25, 1986, charged defendant with first degree murder (Pen. Code, § 187)[1] and alleged that he committed the murder while attempting to commit rape (former § 190.2, subd. (a)(17)(iii)) and unlawful oral copulation (former § 190.2, subd. (a)(17)(vi)). The information also alleged that the murder involved torture (§ 190.2, subd. (a)(18)) and that defendant used a deadly weapon (§ 12022, subd. (b)). The information alleged defendant had two prior felony convictions (former § 667.5, subd. (b)): possession of a concealed firearm by a felon (§ 12021) and receiving stolen property (former § 496, subd. 1). Defendant admitted the two prior felony convictions before trial. Testimony began in defendant's trial on March 21, 1989. Two days later, defendant pleaded guilty to first degree murder and admitted the special circumstances of attempted oral copulation and torture. He also admitted personal use of a deadly or dangerous weapon. Defendant did not admit the attempted rape special circumstance, which the court dismissed at the prosecution's request. The penalty phase of defendant's trial began on April 4, 1989. At the conclusion of the penalty phase, the jury returned a verdict of death, and the court sentenced defendant to death.

[1] All statutory references are to the Penal Code unless otherwise indicated.

The appeal to this court is automatic. (§ 1239, subd. (b).) We briefly review the evidence at the guilt and penalty phases.

## A. *Guilt Phase Evidence*

On the morning of December 12, 1985, Wendy Cheek told her friend, John Adkins, that she planned to attend a party at Adkins's house that evening. Adkins lived in the Haight-Ashbury neighborhood of San Francisco, not far from where Cheek lived. Cheek did not appear at the party. One week later, Adkins received a telephone call from Cheek's mother, who was worried because the family had not heard from her. Adkins looked for Cheek. He found her car parked near his house on the 900 block of Clayton Street.

On December 14, a motorist found a body in a grove of trees near highway 280 in San Mateo County. The body was naked, had numerous stab wounds, and was partially burned. Abandoned automobile parts had been placed over the body in an apparent attempt to conceal it. Fingerprints established that the body was Cheek's.

After the prosecution presented the above evidence, defendant changed his plea to guilty.

## B. *Penalty Phase*

### 1. *Prosecution's Evidence*

Most of the evidence that would have been relevant at the guilt phase if defendant had not pleaded guilty was relevant at the penalty phase because it related to "[t]he circumstances of the crime" or "the existence of [the] special circumstances." (§ 190.3, factor (a).) Accordingly, the prosecution's penalty phase evidence in some respects resembles a trial of guilt.

The pathologist who conducted the autopsy on Cheek's body testified that Cheek had been burned extensively with gasoline but had died before being set on fire. A number of blunt injuries on Cheek's head and torso were consistent with blows from a fist. Multiple puncture wounds on the back of her head and neck appeared to be from a Phillips screwdriver. Other puncture wounds were consistent with stabbing by a barbecue fork. Stab wounds in her neck and upper back appeared to be from a knife. Two stab wounds, four and one-half to five inches deep, pierced Cheek's right lung and aorta, causing massive bleeding and death within a few minutes. Cheek had blood under her fingernails, suggesting she had scratched someone shortly before she died.

Phyllis Marie Kitchell Fairbank (Kitchell), who lived with defendant at 953 Clayton Street near where Adkins had found Cheek's car, testified that defendant often abused her physically, causing her to seek medical treatment. Kitchell was hospitalized in early December 1985. On the evening of December 12, the day Cheek disappeared, defendant visited Kitchell in the hospital. Defendant was upset and had fresh scratches on his face. He said two other people had gotten him involved in a murder. The murder had taken place "up in the hills, in woods," but he did not admit personal involvement in the killing. The next day, defendant picked Kitchell up at the hospital. Defendant drove Kitchell's car, to which he had access while she was in the hospital. After meeting Kitchell, defendant picked up laundry from a laundromat, including bedding that he and Kitchell normally cleaned at home. When Kitchell arrived home, she discovered that a steamer trunk was missing. A car wash owner later found a bloodstained steamer trunk that matched the missing one abandoned at a San Francisco car wash.

During the evening of December 14, defendant began to abuse Kitchell. He punched and kicked her repeatedly during this encounter. Kitchell called the police and claimed to have overdosed. An ambulance took her to the hospital. The next day, Kitchell admitted to a therapist at the hospital that she had not overdosed. She told the therapist what had really happened, and she again called the police. The police arrested defendant, and Kitchell returned home. Within a couple of days, Kitchell noticed that a rug from the front room was now in the bedroom. When Kitchell moved the rug, she noticed it covered a large hole in the carpet.

Kitchell's sister, Toni Stracener, testified that she stayed for a few months at defendant's and Kitchell's apartment after Kitchell returned home from the hospital. On December 16, defendant called Stracener and told her part of the carpet was missing because the cats had soiled it. Defendant asked Stracener to replace the missing carpet. Stracener told defendant she would do so.

Detective Mike Dirickson testified that he visited the apartment at 953 Clayton Street on December 27, 1985. Kitchell was speaking with defendant on the phone when Dirickson arrived. Defendant told Kitchell not to let the police in the apartment, but Stracener had already let them in. Defendant also told Kitchell to get rid of his jeans. Kitchell gave these jeans to the police. Kitchell had also discovered that her red bodysuit had blood on it and was stretched. She gave the bodysuit to the police. While Dirickson was at the apartment, defendant also spoke with Stracener. Stracener told defendant that the police were there, and defendant asked Stracener if she had replaced the missing carpet in the bedroom. Kitchell showed the police the missing

carpet. Dirickson observed blood along the edges of the carpet and blood spatters on the bed frame. Dirickson also examined Kitchell's car and found a flashlight with blood smeared on the handle and a Phillips screwdriver.

The next day, Dirickson returned to the apartment with a criminalist from the county forensic laboratory. The criminalist found blood on a wall above the bed, on a table adjacent to the bed, in the living room, and on the back door. He also discovered a large amount of blood on the mattress of the bed. Genetic marker testing indicated that the blood on the carpet and mattress matched Cheek's blood. The criminalist opined that only 1 in 66,000 people had that type of blood. The criminalist was able to rule out defendant's blood and Kitchell's blood. The criminalist also examined the blood found in the steamer trunk. Testing revealed this blood was consistent with Cheek's blood. Finally, the criminalist examined the blood on Kitchell's red bodysuit. It was consistent with Cheek's blood, and not Kitchell's blood. The criminalist returned to the apartment on January 2, 1986, and conducted luminol testing to detect blood that was not otherwise visible. The testing revealed footprints leading from the bedroom to other parts of the apartment. After comparing the footprints to sample footprints he had taken from defendant, the criminalist could not exclude defendant as the source.

John Szymkiewicz testified that he became acquainted with defendant while occupying a jail cell near defendant's in the spring of 1986. Szymkiewicz was facing robbery, assault, and false imprisonment charges, and he admitted he had cooperated with police in return for a reduction of his own sentence from 22 or more years to 10 years. While in jail, defendant approached Szymkiewicz about having "a girl named Phyllis" hurt "because she was a snitch." Defendant spoke to Szymkiewicz and also passed him notes. One note read, "I want Phyllis & her snitch ass sister beat on some & scared to living hell, then smash in 25[-inch] color TV, smash computer, & anything else of value!!! I want the car totalled! I imagine the car can be done first or whatever these dudes decide. One of many reasons I want it done is to keep them from testifying against me next week!!" In another note, defendant indicated he wanted Kitchell's leg or arms broken and wrote, "I for sure want this done & No I won't change my mind!!" Defendant said he would pay Szymkiewicz. Kitchell testified that defendant called and threatened her before his preliminary hearing, telling her that "other people" would break her arms and legs if she testified against him. Stracener also testified that defendant called and threatened her.

Arlene G., who lived near defendant's apartment, testified that, on December 5, 1985, a week before Cheek's disappearance, she parked on defendant's block and stopped to pet a cat as she walked home. Defendant

invited her to look at the cat's kittens. Once she was in a bedroom of defendant's apartment, defendant admitted he really had no kittens. As Arlene attempted to leave, defendant asked her if she wanted to make $1,000 modeling lingerie. Arlene was still trying to leave the apartment, getting within inches of the front door, when defendant grabbed her from behind and hit her hard on the left side of her face. Defendant continued to hit her before forcing her into a bedroom. He then forced her to orally copulate him. She tried to escape by winning his trust, but did not succeed. Defendant forced her to orally copulate him several more times. He also penetrated her vagina and anus with his finger and asked her to remove her clothing and put on a red bodysuit, which was very small. Defendant used a hypodermic needle to inject a brownish liquid into a vein in his arm, and he repeatedly asked Arlene if she wanted cocaine, though she did not see anything that looked like cocaine. He made numerous telephone calls, apparently in an attempt to purchase drugs and also to listen to pornography.

Later, defendant apologized to Arlene for hitting her and said he wanted to take her out to dinner. Defendant permitted her to put her clothes back on, and they left the apartment together. When someone in a car passed close enough to hear Arlene scream, she walked away from defendant, who did not follow.

Dr. Deborah Heath, who had frequent contact with drug users, testified that drug users who want drugs sometimes insert a previously used hypodermic needle into a vein, draw out their blood, and then inject the blood back into the vein. The drug users believe the residue in the used syringe and needle will be enough to make them high.

Jennifer Roth testified that, in October 1979, she lived with defendant on Irving Street in San Francisco. When defendant suspected Roth of having a relationship with another man, a fight ensued. Defendant tore up the bedroom, hit Roth, put a bullet in a pistol, spun the cartridge, put the barrel of the pistol to Roth's head, and pulled the trigger.

The prosecution also presented evidence indicating that, on December 5, the day of the Arlene G. sexual assault, and again on December 12, the day Cheek disappeared, someone placed a series of telephone calls from defendant's apartment to a telephone number that connected to a pornographic recording.

Finally, the prosecution presented documentary evidence of the following prior convictions: second degree burglary (June 24, 1975), receiving stolen property (Dec. 11, 1975), battery with serious bodily injury (Oct. 12, 1976),

felon in possession of a weapon (Jan. 22, 1980), receiving stolen property (Apr. 26, 1983), and several counts of forced oral copulation and forced penetration of genital or anal openings (Sept. 25, 1986).

### 2. *Defense Evidence*

The defense elicited from Kitchell on cross-examination that she met defendant when he was in the hospital receiving psychiatric treatment. They spent Christmas together, which was "wonderful." They both liked camping, walking, going to the beach, and going to movies. They talked about having a family, owning a home, and possibly starting a business. Kitchell also described how cocaine use affected defendant's personality, causing paranoia and explosive outbursts of rage.

The defense also elicited from Roth that, around the time defendant assaulted her with a pistol, defendant's personality changed because of heavier drug use. He lost weight, had needle track marks, became angry and paranoid, and abused himself. After receiving treatment for drug use, defendant became "the original self" whom Roth knew, "a good person, a nice person, fun to be with." Roth testified that defendant rarely worked, that his mother helped support him, and that "he knew that he could get whatever he wanted from [his mother]." After defendant's mother died, he received money from a trust fund that his mother established for his benefit.

Dr. H. Westley Clark testified about the effects of defendant's longtime substance abuse. Dr. Clark reviewed defendant's medical and hospital records. He testified that the primary reasons for defendant's hospitalizations were cocaine dependency, alcohol abuse, and marijuana abuse. He also testified that defendant's efforts to obtain prescriptions for various tranquilizers in December 1985 were consistent with the effects of cocaine abuse. Dr. Clark concluded that defendant's "chemical dependency was quite severe."

The defense also presented evidence relating to defendant's childhood. Defendant's father, Robert Fairbank, Sr., testified that defendant grew up in a "very nice" neighborhood of a small resort community on the Connecticut coast. The family lived with defendant's maternal grandfather. Defendant's father agreed that he and his wife drank often, and he characterized his wife as a heavy drinker. He also testified that his father-in-law's wealth and interference in household affairs caused constant tension and resulted in fights with his wife. During one argument, defendant's mother spit in defendant's father's face. Defendant's father then hit her, and she fell through a glass door when she tried to retaliate. Defendant's father denied

hitting defendant, but other witnesses who knew the family testified that he often hit defendant, who was afraid of his father. As defendant grew older, he had a few minor brushes with the law, and two private schools expelled him. According to defendant's father, defendant's grandfather and mother spoiled defendant with presents whenever he did something wrong. On one occasion defendant's mother bought him a boat after police arrested him. In 1968, when defendant was 16 years old, he and his father got into a fight. Defendant hit his father, who suffered a broken rib. Defendant's parents were divorced a short time later.

The defense called several witnesses who knew defendant and his family when he was growing up. Though he grew up in an affluent coastal community, one witness described defendant's upbringing as "perfectly awful." Defendant's father was "nasty, sarcastic, abusive," and a "frustrated, mean-spirited" person who repeatedly verbally abused defendant's mother. Defendant's father also yelled at and humiliated defendant. Defendant feared his father. One witness described an occasion when defendant's father struck defendant hard in the face without provocation. This type of abuse was "common knowledge in the community."

Defendant liked to perform dangerous stunts and had a reputation in the community as a "bad boy." He stole money from a neighbor's house, and he and a friend frequently broke into summer houses. He repeatedly beat up this friend to show off to other friends. Despite this misbehavior, defendant's mother would make excuses for him and spoil him with "all sorts of material things." Defendant's grandfather would also spoil him and bail him out of trouble.

Dr. Alfred Fricke, a clinical psychologist, performed research on defendant and his background and testified about defendant's psychological makeup. Dr. Fricke described defendant as a hyperactive child "born into . . . a family caldron." Defendant grew up with an "abusive, angry dad" who at some point "gave up on him, and the kid could do no right." Dr. Fricke opined that defendant's father felt emasculated because he could not provide for his family alone. He had high expectations for his son. Dr. Fricke considered it significant that, while defendant's father abused defendant, his mother spoiled him but did nothing to stop his father's abuse. This type of background "sets up the pattern for a man to later on develop the kind of [abusive] relationships that he has as an adult." Dr. Fricke concluded that the conflicting signals defendant received from his parents prevented him from developing a conscience.

Dr. Fricke also administered a battery of psychological tests to defendant. The tests did not reveal that defendant suffered from any psychosis or mental

illness. Dr. Fricke concluded that defendant had an antisocial personality disorder and suffered from drug addiction. While defendant's drug addiction exacerbated his antisocial behavior, Dr. Fricke testified that defendant would still suffer from the antisocial personality disorder without the drugs. The drugs made defendant unpredictable, irrational, and paranoid. Nevertheless, according to Dr. Fricke, defendant was "fully responsible for his behavior and his life." He was entirely capable of realizing that his various acts of theft, assault, and murder were wrong, but he just did not care about the consequences of his actions. Dr. Fricke thought defendant would respond well to the structured environment of prison.

## DISCUSSION

### A. Jury Selection Issues

During voir dire, defendant unsuccessfully challenged various prospective jurors for cause (Code Civ. Proc., § 225, subd. (b)(1)), including Thomas A. Wood and Jerome J. Foster. Defendant later exercised peremptory challenges with respect to many of these individuals, but, with Wood and Foster still remaining on the prospective jury and with four unused peremptory challenges, defense counsel told the court, "We accept the panel." Defendant argues on appeal that the trial court improperly denied some of his challenges for cause, thus violating his "right to an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution and under the California Constitution (art. I, § 16), his right to due process of law under the Fourteenth Amendment and the California Constitution (art. I, §§ 7 & 15), and his right to a reliable penalty determination under the Eighth and Fourteenth Amendments and the California Constitution (art. I, §§ 7, 15, & 17)."

As we recently explained, "To preserve a claim of trial court error in failing to remove a juror for bias in favor of the death penalty, a defendant must either exhaust all peremptory challenges and express dissatisfaction with the jury ultimately selected or justify the failure to do so." (*People* v. *Williams* (1997) 16 Cal.4th 635, 667 [66 Cal.Rptr.2d 573, 941 P.2d 752]; see also *People* v. *Kirkpatrick* (1994) 7 Cal.4th 988, 1005 [30 Cal.Rptr.2d 818, 874 P.2d 248]; *People* v. *Morris* (1991) 53 Cal.3d 152, 184 [279 Cal.Rptr. 720, 807 P.2d 949]; *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1087 [259 Cal.Rptr. 630, 774 P.2d 659].) Defendant argues that here his failure to exercise all of his peremptory challenges was justified. He asserts that, when he accepted the jury, the jury panel from which the clerk was selecting prospective jurors included three persons whom defendant had unsuccessfully challenged for cause, two of whom he had challenged during both

general voir dire and *Hovey* voir dire. (*Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301] [requiring individual, sequestered examination of jurors' attitudes about the death penalty].) He points out that, if he had exhausted his peremptory challenges and excluded Wood and Foster, "there was a clear possibility of having empaneled at least one juror, and possibly two, who had been challenged at both sessions." We do not, however, accept such after-the-fact justifications for a defendant's failure to exercise all peremptory challenges when, as here, the defendant offered no such justification at trial.

In *People* v. *Danielson* (1992) 3 Cal.4th 691 [13 Cal.Rptr.2d 1, 838 P.2d 729], the defendant asserted, as defendant does in this case, that, if he had exercised his peremptory challenge to exclude a particular juror, he might have ended up with a juror who was even more unfavorable. We rejected the argument, stating, "But the fact remains that counsel expressed satisfaction with the jury selected . . . , without using his remaining peremptory challenge and without requesting additional challenges. [¶] . . . [¶] . . . [W]e conclude that, by expressing his satisfaction with the jury without exhausting such challenges or requesting additional challenges, defendant waived his right to complain about the court's failure to excuse [a particular juror] for cause." (*Id.* at pp. 713-714.) Because defendant accepted the jury without reservation and without exhausting his peremptory challenges, he cannot now complain that the court should have granted his challenges for cause. (*People* v. *Carpenter* (1997) 15 Cal.4th 312, 355-356 [63 Cal.Rptr.2d 1, 935 P.2d 708]; see also *Ross* v. *Oklahoma* (1988) 487 U.S. 81, 86-88 [108 S.Ct. 2273, 2277-2278, 101 L.Ed.2d 80].)

B. *Guilt Phase Issues*

1. *Ineffective Assistance of Original Defense Counsel*

John Szymkiewicz contacted police about information he had obtained, including notes he claimed defendant had written to him. Szymkiewicz reported that defendant had solicited him either to confess to Cheek's murder or to establish an alibi for defendant. The notes, which Szymkiewicz continued to receive after he contacted police, informed him about the details of Cheek's death so that he would be convincing when police questioned him. The notes included a detailed map of defendant's apartment, indicating the blood spot in the bedroom where Cheek apparently died. The notes also stated: "I foolishly told lawyer where weapons were," "[M]y attorneys now have weapons & D.A. doesn't know it yet!" and "D.A. does not know that a BBQ fork was one of the weapons."

On July 22, 1986, the prosecution moved for an order compelling production of these weapons, citing *People* v. *Meredith* (1981) 29 Cal.3d 682,

694-695 [175 Cal.Rptr. 612, 631 P.2d 46] (*Meredith*). In *Meredith*, a defense investigator retrieved the victim's wallet from a trash can behind the defendant's home. The investigator gave the wallet to defense counsel, who examined it and then gave it to police. (*Id.* at p. 686.) We held that ". . . whenever defense counsel removes or alters evidence, the statutory [attorney-client] privilege does not bar revelation of the original location or condition of the evidence in question." (*Id.* at p. 695, fn. omitted.) We noted that a contrary rule would "permit[] the defense in effect to 'destroy' critical information," because removal of the evidence would deprive the prosecution of the opportunity to observe the evidence in its original condition and location. (*Id.* at p. 694.)

In response to the prosecution's motion to compel production of evidence, defense counsel argued that, if they did have the weapons, which they did not admit, they did not have to produce them. Defense counsel relied on *Goldsmith* v. *Superior Court* (1984) 152 Cal.App.3d 76 [199 Cal.Rptr. 366] (*Goldsmith*), in which the prosecution sought to obtain, through pretrial discovery, a weapon the defendant had allegedly used in committing three felonies. The Court of Appeal held that production of the weapon would violate the defendant's privilege against self-incrimination. (*Id.* at p. 80.)

The trial court denied the prosecution's motion to compel production of the weapons, but the Court of Appeal granted a petition for writ of mandate. (*People* v. *Superior Court* (*Fairbank*) (1987) 192 Cal.App.3d 32 [237 Cal.Rptr. 158].) The court noted that, as in *Meredith*, and unlike *Goldsmith*, defense counsel had allegedly removed the murder weapons from the location where defendant had left them, thus preventing the prosecution from finding and observing them in place. (*People* v. *Superior Court* (*Fairbank*), *supra*, 192 Cal.App.3d at p. 39.) The court held that, when defense counsel removes or alters physical evidence, counsel must immediately inform the court. The court must then act to ensure the prosecution has timely access to the evidence and information about its alteration. (*Id.* at pp. 39-40.) The court rejected defense counsel's argument that, as long as they did not destroy or permanently conceal the evidence, they could withhold it from the court and the prosecution before trial in order to present it as part of the defense case. (*Id.* at p. 37.)

After the Court of Appeal issued its decision, defense counsel turned over certain evidence to the prosecution, including a knife, clothing, and a steamer trunk. Defense counsel then sought a protective order barring the prosecution from presenting the evidence at trial. Defense counsel explained to the court outside the presence of the prosecution that they intended to offer this evidence as part of the defense case to establish defendant's

credibility with the jury "because here is a man who is coming forward with what potentially from one valuation is inculpatory evidence." The trial court denied the protective order, the Court of Appeal denied defendant's petition for a writ of mandate, and we denied review. At that point, because the notes to Szymkiewicz cast defense counsel "in an odious light" and because counsel had become potential prosecution witnesses, the court granted their motion to withdraw.

■ Defendant now argues that his original trial counsel were incompetent for moving this evidence. He rejects as making "no sense" counsel's purported strategy of offering the evidence to establish his credibility with the jury. He further argues counsel's incompetence prejudiced him because, had they not removed the evidence, investigators might never have found it. That circumstance, he argues, would have been far more favorable for his case than any use his counsel might have made of the evidence.

We cannot conclude that defendant's original trial counsel were incompetent without further development of the factual record, including, if available, sworn testimony addressing why counsel moved the evidence. The record indicates that counsel intended to offer the evidence as part of the defense case in order to establish defendant's credibility, but this explanation, which appears in unsworn statements counsel made to the trial court, may not be complete or wholly accurate. Therefore, whatever we might conclude about the reasonableness of counsel's purported strategy, the current record is inadequate to justify a finding that counsel were incompetent.

■ In any case, when considering a claim of ineffective assistance of counsel, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 697 [104 S.Ct. 2052, 2069, 80 L.Ed.2d 674].) A defendant must prove prejudice that is a " 'demonstrable reality,' not simply speculation." (*People* v. *Williams* (1988) 44 Cal.3d 883, 937 [245 Cal.Rptr. 336, 751 P.2d 395], quoting *People* v. *Stephenson* (1974) 10 Cal.3d 652, 661 [111 Cal.Rptr. 556, 517 P.2d 820].) Prejudice requires "a reasonable probability that a more favorable outcome would have resulted . . . , i.e., a probability sufficient to undermine confidence in the outcome." (*In re Clark* (1993) 5 Cal.4th 750, 766 [21 Cal.Rptr.2d 509, 855 P.2d 729], citing *Strickland* v. *Washington, supra*, 466 U.S. at pp. 693-694 [104 S.Ct. at pp. 2067-2068].)

■ Here, defendant's claim of prejudice assumes the prosecution would never have obtained the knife, the clothes, and the steamer trunk but

for his counsel's actions. We cannot determine whether this assumption is correct without a more complete factual record. (*People* v. *Mendoza Tello* (1997) 15 Cal.4th 264, 266 [62 Cal.Rptr.2d 437, 933 P.2d 1134].) Moreover, the limited record that we have does not establish that the knife, the clothes, and the steamer trunk played a key role in defendant's decision to plead guilty. For example, in his motion to withdraw his guilty plea, defendant did not assert that he pleaded guilty because of this evidence. Other evidence in this case included the location of Cheek's car near defendant's apartment, fresh scratches on defendant's face on the evening Cheek disappeared, traces of blood under Cheek's fingernails, defendant's admission to Kitchell that he was involved in a murder, the large hole in defendant's carpet, defendant's varied efforts to conceal evidence of the crime, blood in defendant's apartment that closely matched Cheek's blood, blood in Kitchell's car, blood on Kitchell's red bodysuit, defendant's detailed notes to Szymkiewicz indicating private knowledge about the crime and the murder weapons, defendant's request that Szymkiewicz hire someone to injure Kitchell and Stracener, Arlene G.'s testimony that defendant sexually assaulted her just a week before Cheek disappeared and that he repeatedly called a pornography telephone number during the course of the assault, telephone calls from defendant's apartment to a pornography telephone number on the day Cheek disappeared, and Jennifer Roth's testimony that defendant recklessly pulled the trigger on a partially loaded pistol while pointing it at her head. Given all this evidence, which may not be the extent of the prosecution's evidence, defendant has not established a "reasonable probability" that he would not have pleaded guilty if the prosecution had never obtained the knife, the clothes, and the steamer trunk. (*Strickland* v. *Washington, supra,* 466 U.S. at p. 694 [104 S.Ct. at p. 2068].)

Defendant argues that the prosecution had little evidence supporting the special circumstance allegations of attempted oral copulation and torture. Because defendant admitted these allegations, we do not know what evidence the prosecution may have had. In any case, the additional evidence the prosecution obtained as a result of defense counsel's actions—that is, the knife, the clothes, and the steamer trunk—was at most marginally relevant to the special circumstance allegations. Moreover, we can discern from the penalty phase record that the prosecution had at least circumstantial evidence indicating defendant followed a pattern of conduct with Cheek similar to that which he had followed a week earlier with Arlene G., including attempted oral copulation. Similarly, the multiple blunt injuries and stab wounds on Cheek's body, indicating blows from a fist and separate attacks with three different weapons, supported a finding of torture. (*People* v. *Crittenden* (1994) 9 Cal.4th 83, 139-140 [36 Cal.Rptr.2d 474, 885 P.2d 887] [multiple stab wounds sufficient to prove torture].)

## 2. *Ineffective Assistance of Replacement Defense Counsel*

■ Defendant also argues that, after his original counsel withdrew, his replacement counsel were incompetent for conceding to the jury during voir dire that defendant had killed Cheek, for later advising him to plead guilty "without *any* reciprocal benefit," and for consenting to the guilty plea.

■ "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.]" (*Strickland* v. *Washington, supra,* 466 U.S. at p. 689 [104 S.Ct. at p. 2065].) ■ During voir dire, counsel could reasonably have decided, in light of very strong evidence that defendant killed Cheek, to concede that point and focus the jury's attention on the degree of murder and the truth of the special circumstance allegations. Defendant cites no case suggesting this strategy constitutes ineffective assistance. (Cf. *People* v. *Freeman* (1994) 8 Cal.4th 450, 498 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888]; *People* v. *Wade* (1988) 44 Cal.3d 975, 988 [244 Cal.Rptr. 905, 750 P.2d 794]; *People* v. *Jackson* (1980) 28 Cal.3d 264, 292-293 [168 Cal.Rptr. 603, 618 P.2d 149].)

Similarly, defendant's subsequent guilty plea and admission of two of the special circumstance allegations were reasonable tactical decisions in light of the compelling evidence against defendant, and therefore they do not establish ineffective assistance of counsel, assuming defendant acted on the advice of counsel. As noted, most of the evidence that the jury would have considered as part of the guilt phase if defendant had not pleaded guilty was also relevant at the penalty phase because it related to "[t]he circumstances of the crime" or "the existence of [the] special circumstances." (§ 190.3, factor (a).) Nevertheless, defendant's guilty plea and other admissions enabled him to prevent the jury from seeing or hearing about many of the notes he wrote to Szymkiewicz, because the trial court ruled that these notes, which would have been admissible at the guilt phase of trial to show consciousness of guilt, should be excluded from the penalty phase. The trial

court's decision to exclude these notes was, of course, discretionary, and we do not mean to suggest that a defendant can guarantee the exclusion of certain evidence by pleading guilty. We merely conclude that in this case defendant's guilty plea enabled him to prevent the jury from learning of these notes, and in that sense it was tactically reasonable.

Moreover, by pleading guilty, defendant could try to cast himself in a sympathetic light to the jury. Defendant argues that his counsel squandered this potential advantage by not asking for juror sympathy on his behalf. Counsel argued, "You will not hear me ask for your sympathy for Mr. Fairbank. Your sympathy, my sympathy[,] everybody's sympathy is not for Mr. Fairbank, it's with Miss Cheek." Nevertheless, counsel did not forgo the opportunity to emphasize to the jury that defendant had admitted his guilt, saying, "He must be punished, and we must be protected. Even Mr. Fairbank has accepted that by virtue of pleading guilty." Counsel also argued, "Well, by his guilty plea in this case, Mr. Fairbank, I think, has made [as] strong a statement to you as he can that . . . he can accept some blame for what he's done." Finally, at the end of the argument counsel said, "[A]fter a lifetime of wrong doing [sic], a lifetime of denying responsibility, for one of the few times in his life [defendant] did something right and appropriate, pled guilty to these charges. No deals. No plea bargaining. No promises. . . . He just pled guilty. For once he did the right thing. After doing many wrong ones."

Thus, counsel clearly asked the jurors to view defendant as favorably as they could under the circumstances. As we have said, where "counsel could reasonably have viewed the guilt phase evidence as overwhelming[, w]ithin the bounds of reasonable tactical decisionmaking, he could also have perceived a guilty plea as a demonstration of appellant's honesty and candor that would elicit jury sympathy or, at a minimum, avoid an irremediable adverse jury reaction to an unfounded denial of the crimes." (*People* v. *Wrest* (1992) 3 Cal.4th 1088, 1115 [13 Cal.Rptr.2d 511, 839 P.2d 1020].) Defendant attempts to distinguish *Wrest,* arguing that, unlike the defendant in *Wrest,* he changed his plea to guilty after his counsel had conceded during voir dire that he had killed Cheek and after the prosecution began presenting evidence. Neither distinction is significant.

During voir dire, defense counsel conceded only that the jury would find defendant guilty of killing Cheek. They did not concede the degree of murder or the truth of any of the special circumstance allegations. The subsequent guilty plea was a more comprehensive acknowledgment of wrongdoing and enhanced the tactical benefits of the earlier concession. The fact that the prosecution had already begun to present evidence when defendant pleaded guilty did not undermine these tactical benefits. The

prosecution had only presented a small part of its evidence, and it did not present the same evidence a second time during the penalty phase.

Defendant also argues that, unlike the defendant in *Wrest*, he had strong defenses to the special circumstance allegations. Because of defendant's guilty plea, the record does not disclose what these defenses would have been. Nevertheless, as we discussed above, we can discern from the penalty phase record that the prosecution had persuasive evidence supporting the allegations of attempted oral copulation and torture. Admitting these allegations was a reasonable strategic choice under the circumstances. These admissions strengthened defendant's argument for exclusion of unfavorable evidence from the penalty phase, and they allowed defendant to present himself to the jury as being fully cooperative.

Finally, defendant argues that, even if we find he was not prejudiced by the incompetence of his original counsel or his replacement counsel, we should find the cumulative effect of their incompetence to have been prejudicial. He asserts violations of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and article I, sections 1, 7, 15, 16, and 17 of the state Constitution. Because we do not find that his replacement counsel were incompetent, defendant's cumulative effect argument fails.

### 3. *Factual Basis for Guilty Plea*

■ Defendant argues that the trial court failed to make an adequate record of the facts that supported his guilty plea and special circumstance admissions. In *People* v. *Hoffard* (1995) 10 Cal.4th 1170 [43 Cal.Rptr.2d 827, 899 P.2d 896], we held that a trial court has no duty to inquire into the factual basis of a plea that is "unconditioned upon receipt of a particular sentence or other exercise of the court's powers." (*Id.* at p. 1181.) We noted that section 1192.5 requires the trial court to " 'satisfy itself . . . that there is a factual basis for the plea,' " but that section, by its terms, applies only to "negotiated pleas." (*People* v. *Hoffard*, *supra*, 10 Cal.4th at p. 1181, citing *People* v. *Johnson* (1974) 10 Cal.3d 868, 871 [112 Cal.Rptr. 556, 519 P.2d 604].) We acknowledged that "[c]onducting a factual basis inquiry . . . may further important interests," and "we approve[d] of the practice . . . of attempting to ensure the existence of a factual basis for all guilty and no contest pleas," but we "decline[d] . . . to impose, as a new rule of criminal procedure, a duty for the trial court in all cases to establish on the record the existence and nature of the factual basis for a plea." (*People* v. *Hoffard*, *supra*, 10 Cal.4th at pp. 1183-1184, fn. omitted.)

Defendant now asks us to impose this duty for all *capital* cases. He argues that in capital cases "the fairness and accuracy of the process deserves

greater scrutiny," and "the pressure to [plead guilty] may be undeniably strong." He also reasserts that in this case the prosecution had little evidence to support the special circumstance allegations. He recognizes that defense counsel stipulated to the factual basis of his plea and admissions, but he argues that a stipulation is not sufficient.

We do not agree that the possibility of receiving the death penalty would increase the pressure on a defendant to plead guilty. On the contrary, we think the possibility of receiving the death penalty would cause a defendant to think very carefully before entering a guilty plea. Of course, fairness and accuracy are important in all criminal proceedings, whether or not involving the death penalty, but we do not believe that a rule requiring the trial court to inquire into the factual basis of an unconditioned plea is either necessary or appropriate to protect defendants in capital cases.

### 4. *Massiah Motion*

As noted, John Szymkiewicz, who was awaiting sentencing, contacted police about information he had, including certain notes he claimed defendant had written him. On May 14, 1986, Detectives Dirickson and Poynter of the San Mateo County Sheriff's Department met with Szymkiewicz, who told them what he knew and asked about a possible "deal" with respect to his sentence. The detectives told Szymkiewicz they would talk to the district attorney, but they did not suggest a deal was probable; they made no promises; and they did not instruct Szymkiewicz to try to obtain more information from defendant. They added that they needed proof, i.e., the original notes, but Szymkiewicz would not provide the notes until he had "some kind of solid deal."

After Szymkiewicz first met with police, defendant continued to provide him information about the Cheek murder, including more notes, but Szymkiewicz did not initiate these contacts. Szymkiewicz also had further discussions with Detectives Poynter and Dirickson. Most of these discussions concerned the status of negotiations with respect to his sentence. The detectives told him the deputy district attorney handling his case was not inclined to make a deal, and they continued to ask him for the notes. To show the detectives what information he possessed, Szymkiewicz recopied the notes in his own handwriting and gave the copies to the detectives.

The detectives again made no promises to Szymkiewicz. They did not instruct him to elicit more information from defendant, and they did not suggest that more information would facilitate negotiations with the district attorney. Detective Poynter, however, believed Szymkiewicz was going to

continue to try to obtain information from defendant. In addition, the deputy district attorney handling defendant's case intervened to prevent the sheriff's department from moving defendant, hoping he would continue to provide Szymkiewicz with information.

Defendant and his attorneys discovered Szymkiewicz was an informant on May 23, 1986. Szymkiewicz eventually turned over the original notes and received a lower sentence than he otherwise would have received.

Defendant moved to exclude the notes and defendant's oral statements to Szymkiewicz pursuant to *Massiah* v. *United States* (1964) 377 U.S. 201, 206-207 [84 S.Ct. 1199, 1203, 12 L.Ed.2d 246] (*Massiah*). Defendant argued that Szymkiewicz acted as a government agent who deliberately elicited incriminating information from defendant, in violation of his Sixth Amendment right to have counsel present during interrogation. After a hearing on the merits, the trial court denied defendant's motion, finding "beyond a reasonable doubt that there is no *Massiah* violation."

█ To prove a violation of the Sixth Amendment, a defendant "must establish that the informant . . . was acting as a government agent, i.e., under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage." (*In re Neely* (1993) 6 Cal.4th 901, 915 [26 Cal.Rptr.2d 203, 864 P.2d 474].) If an informant "acts on his own initiative," even if he interrogates the accused, "the government may not be said to have deliberately elicited the statements." (*People* v. *Whitt* (1984) 36 Cal.3d 724, 742 [205 Cal.Rptr. 810, 685 P.2d 1161]; see also *In re Neely, supra,* 6 Cal.4th at p. 915; *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1240 [275 Cal.Rptr. 729, 800 P.2d 1159].) "[A] preexisting arrangement [with government agents], however, . . . need not be explicit or formal, but may be 'inferred from evidence that the parties behaved as though there were an agreement between them, following a particular course of conduct' over a period of time. [Citation.]" (*In re Neely, supra,* 6 Cal.4th at p. 915, quoting *U.S.* v. *York* (7th Cir. 1991) 933 F.2d 1343, 1357.) Specific direction from government agents (*In re Neely, supra,* 6 Cal.4th at p. 915) or a prior working relationship with government agents (*id.* at pp. 917-918; *People* v. *Gonzalez, supra,* 51 Cal.3d at p. 1241) can establish an implicit agreement. Once the defendant establishes "a preexisting arrangement," the "defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." (*Kuhlmann* v. *Wilson* (1986) 477 U.S. 436, 459 [106 S.Ct. 2616, 2630, 91 L.Ed.2d 364].)

Whether to allow an informant's testimony is "an essentially factual question, and we review it on a deferential standard." (*People* v. *Memro*

(1995) 11 Cal.4th 786, 828 [12 Cal.4th 783d, 47 Cal.Rptr.2d 219, 905 P.2d 1305].) Here, the trial court reasonably found that police did not use Szymkiewicz deliberately to elicit incriminating statements and writings from defendant.

With respect to notes and information defendant gave to Szymkiewicz before Szymkiewicz first contacted the police, we see no Sixth Amendment violation. Szymkiewicz acted wholly on his own initiative, and police did nothing to elicit defendant's admissions. "[T]he Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." (*Maine* v. *Moulton* (1985) 474 U.S. 159, 176 [106 S.Ct. 477, 487, 88 L.Ed.2d 481]; see also *In re Neely, supra,* 6 Cal.4th at p. 915; *People* v. *Gonzalez, supra,* 51 Cal.3d at pp. 1240-1241; *People* v. *Williams* (1988) 44 Cal.3d 1127, 1141 [245 Cal.Rptr. 635, 751 P.2d 901]; *People* v. *Whitt, supra,* 36 Cal.3d at pp. 742-743.)

After meeting with police, Szymkiewicz continued to obtain information from defendant, but his contact with police did not by itself make him a police agent. (*People* v. *Whitt, supra,* 36 Cal.3d at p. 744.) Of course, Szymkiewicz may have hoped to receive some benefit in exchange for his ongoing receipt of information, but he nevertheless continued to act on his own initiative. Defendant contends the police and Szymkiewicz operated under an implicit agreement. As noted, a court can infer an agreement between police and an informant if " 'the parties behaved as though there were an agreement between them, following a particular course of conduct' over a period of time. [Citation.]" (*In re Neely, supra,* 6 Cal.4th at p. 915, quoting *U.S.* v. *York, supra,* 933 F.2d at p. 1357.) In addition, an informant's prior working relationship with police may imply an agreement (*In re Neely, supra,* 6 Cal.4th at pp. 917-918), particularly when police knew from the circumstances that the informant likely "would take affirmative steps to secure incriminating information." (*United States* v. *Henry* (1980) 447 U.S. 264, 271 [100 S.Ct. 2183, 2187, 65 L.Ed.2d 115].)

 Here, Detective Poynter believed that Szymkiewicz would continue to try to obtain information from defendant, and a deputy district attorney intervened to prevent the sheriff's department from moving defendant away from Szymkiewicz. But the police made no promises to Szymkiewicz about a possible deal, they did not direct him to obtain more information, and they did not suggest that obtaining more information would benefit him. The trial court specifically found that Szymkiewicz "continued to talk to the defendant on his [own] initiative," and "law enforcement . . . made deliberate and direct efforts and attempts to do everything they could to dispel the fact that

they would be able to be of any help [to Szymkiewicz] and that there was any implied promise of leniency." Substantial evidence supports these findings of the trial court, and therefore we must defer to them. "The police simply made use of [Szymkiewicz's] own motivation to inform on defendant, a technique we found not to be a knowing subversion of the defendant's right to counsel in [*People* v.] *Whitt, supra,* 36 Cal.3d at pages 742-743." (*People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1250 [278 Cal.Rptr. 640, 805 P.2d 899].)

Defendant asserts, citing evidence not in the record, that, before Szymkiewicz informed about defendant, he had acted as an informant about prison gangs to the California Department of Corrections. Of course, we cannot consider on appeal evidence that is not in the record. (*In re Carpenter* (1995) 9 Cal.4th 634, 646 [38 Cal.Rptr.2d 665, 889 P.2d 985].) In addition, assuming Szymkiewicz did act as an informant about prison gangs, defendant does not assert that Detectives Poynter and Dirickson were aware of this fact, and therefore it does not establish an implicit agreement between them and Szymkiewicz. (*People* v. *Whitt, supra,* 36 Cal.3d at p. 744, & fn. 14.) Moreover, even if the police and Szymkiewicz had an implicit agreement, defendant did not show that Szymkiewicz "deliberately elicited" information from him. (*Massiah, supra,* 377 U.S. at p. 206 [84 S.Ct. at p. 1203].) Szymkiewicz denied initiating any communications with defendant, and defendant presented no evidence to the contrary.

Finally, defendant claims that the trial court's erroneous denial of his *Massiah* motion "violated [his] rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution and under article I, sections 1, 7, 13, and 15-17, of the California Constitution, to due process, to fundamental fairness, to confrontation of witnesses, to assistance of counsel, to not incriminate himself, and to be free from outrageous governmental conduct." Because we conclude the trial court properly denied the *Massiah* motion, all these related claims fail.

## C. *Penalty Phase Issues*

### 1. *Ineffective Assistance of Counsel*

Defendant argues that his counsel were incompetent for using Dr. Alfred Fricke as an expert witness and for making certain negative statements about defendant during closing argument.

Dr. Fricke diagnosed defendant as having an antisocial personality disorder, meaning a limited conscience, a diagnosis that is relatively common for

criminals. Dr. Fricke stated that people like defendant "don't take responsibility for their behavior," and "you don't see much remorse." Dr. Fricke testified that defendant's drug use aggravated the situation. Dr. Fricke did not, however, believe defendant was psychotic or schizophrenic, and he concluded defendant was "fully responsible for his behavior and his life."

Defendant argues that Dr. Fricke's testimony that cocaine psychosis was "transient" and "short-lived" undermined Dr. H. Westley Clark's testimony that cocaine psychosis might last "as long as six months." Defendant also complains that Dr. Fricke put too much emphasis on defendant's inherent antisocial predisposition and lack of conscience. Defendant objects that the "the overall tenor" of Dr. Fricke's testimony was unsympathetic to him and that it undermined his strategy of convincing the jury he felt remorse for his crimes.

Defendant has the burden of proving counsel's "representation fell below an objective standard of reasonableness . . . [¶] . . . under prevailing professional norms." (*Strickland* v. *Washington*, *supra*, 466 U.S. at p. 688 [104 S.Ct. at pp. 2064-2065].) Dr. Fricke's partly negative evaluation of defendant is hardly surprising in light of defendant's negative personal history. Defense counsel may well have concluded that Dr. Fricke would gain credibility with jurors by being forthright rather than trying to pretend defendant was someone he clearly was not. In fact, counsel argued to the jury, "Jurors come to court . . . assuming that the defense attorneys are going . . . to try to, perhaps put a white wash over what the defendant is and what he's done. . . . [W]e've done the opposite."

Moreover, the thrust of Dr. Fricke's testimony was favorable to defendant. Dr. Fricke explained how defendant's inherent qualities and the different elements of his troubled upbringing combined to his detriment. Dr. Fricke confirmed that defendant's drug abuse played an important role in his violent criminal behavior. Finally, Dr. Fricke opined that defendant would respond well in the structured environment of prison. Dr. Fricke's testimony that defendant was responsible for his behavior was consistent with defendant's guilty plea and did not undermine his defense. In sum, we cannot say that counsel's decision to use Dr. Fricke as an expert witness "fell below an objective standard of reasonableness . . . [¶] . . . under prevailing professional norms." (*Strickland* v. *Washington*, *supra*, 466 U.S. at p. 688 [104 S.Ct. at pp. 2064-2065]; see also *People* v. *Scott* (1997) 15 Cal.4th 1188, 1224 [65 Cal.Rptr.2d 240, 939 P.2d 354].)

Defendant also argues that his counsel demonstrated incompetence in closing argument because they repeatedly expressed disdain and reprobation for defendant's actions. For example, counsel "condem[ned defendant]

for what he's done" and told the jury, "I don't intend to suggest anything to his credit. By his actions against Miss Cheek he clearly has given up any right to function in our free society. [¶] [The prosecutor] is wrong. You will not hear me asking for mercy for Mr. Fairbank. You will not hear me ask for your sympathy for Mr. Fairbank. Your sympathy, my sympathy[,] everybody's sympathy is not for Mr. Fairbank, it's with Miss Cheek."

Closing argument is as much an art as a science, particularly when counsel is faced with the delicate and difficult task of convincing a jury to exercise leniency toward an individual who has admitted brutal crimes. Counsel must establish as much credibility with the jurors as possible if his effort to persuade them is to succeed. (*People* v. *Scott, supra,* 15 Cal.4th at pp. 1224-1225.) Here, counsel may well have thought that asking for sympathy or speaking favorably about defendant would merely alienate the jurors. Instead, counsel's apparent strategy was to align themselves with the jurors, winning their trust by expressing some of the same emotions they were likely feeling. Counsel's argument did not "[fall] below an objective standard of reasonableness . . . [¶] . . . under prevailing professional norms." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 688 [104 S.Ct. at pp. 2064-2065]; *People* v. *Wade, supra,* 44 Cal.3d at pp. 988-989.)

We conclude defendant did not receive ineffective assistance of counsel in violation of any of his state and federal constitutional rights.

### 2. *Prosecutorial Misconduct*

Defendant argues the prosecutor committed misconduct by introducing into evidence defendant's racial slur. In the course of evaluating defendant, Dr. Fricke administered the "Wechsler Adult Intelligence Scale—Revised" test. One part of the test required defendant to answer a series of factual questions such as, "At what temperature does water boil?"; "Who was President of the United States during the Civil War?"; and "In what month is Labor Day?" During cross-examination of Dr. Fricke, the prosecutor inquired about the test, asking how defendant had responded to specific questions. One of the questions was: "Who was Martin Luther King?" When the prosecutor asked about defendant's response to that question, Dr. Fricke testified that defendant responded: "A dead nigger, don't like Black people."

Defendant points out that the trial court had earlier prohibited the prosecutor from inquiring whether psychological testing had revealed anything about defendant's racial attitudes. Defendant argues the prosecutor committed misconduct by soliciting from Dr. Fricke defendant's answer to the test question about Martin Luther King.

Because defendant raised no objection at trial, he cannot challenge the propriety of the evidence on appeal. (Evid. Code, § 353; see also *People* v. *Jones* (1997) 15 Cal.4th 119, 168, fn. 15 [61 Cal.Rptr.2d 386, 931 P.2d 960]; *People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].) By interposing an objection, defendant probably could have prevented the jury from hearing defendant's answer to the test question about Martin Luther King. The record indicates that the prosecutor only knew a key word from each question, not the entire question. Therefore, the prosecutor asked, "What is question 17 about a king?" Dr. Fricke responded, " 'Who was Martin Luther King?,' " and the prosecutor asked, "Did he answer that one?" Dr. Fricke answered, "Yes," and the prosecutor asked, "What did he say on that one?" Dr. Fricke then gave the answer, "A dead nigger, don't like Black people."

As soon the prosecutor mentioned "question 17 about a king," defense counsel, who presumably had access to Dr. Fricke's records and knew defendant's answers to each of the test questions, could have predicted where the questioning would lead and could have objected. Because the prosecutor had to ask Dr. Fricke two more questions before eliciting defendant's racist comment, defense counsel had ample time in which to interrupt the line of inquiry. Instead, defense counsel remained silent. In addition, defense counsel could have objected after Dr. Fricke reported defendant's racist comment, in which case the court could have admonished the jury not to take defendant's racial attitudes into account. An admonishment of that kind would have negated any possibility of prejudice to defendant. Because counsel did not object at trial, defendant's present claim of prosecutorial misconduct fails.

### D. *Motion to Withdraw Guilty Plea*

 Defendant argues that the trial court erroneously denied his motion to withdraw his guilty plea and his admissions.

After the jury returned a verdict of death, defendant moved to withdraw his guilty plea and his admission of the special circumstance allegations. (§ 1018.) The trial court held a hearing. Defendant testified that the night before he changed his plea to guilty, he participated in a jailhouse party. He and other jail inmates had manufactured a crude alcoholic beverage using water, sugar, and fruit. Defendant testified that he drank six to nine 12-ounce cups of this mixture. At the same time, defendant was taking medications to help him cope with the anxiety of his trial. Defendant took his usual dosage of medication the night of the party. Defendant claimed he had previously saved a number of tablets and distributed these to friends at the party.

Defendant stated he was "[v]ery drunk" and went to sleep about 2 or 3 a.m. Other prisoners more or less corroborated defendant's testimony about the party.

Defendant testified that the morning of his guilty plea, he woke at 8:50 a.m. still drunk from the party. Sheriff's deputies took him to court. He stated that his lawyers pressured him to plead guilty, saying he was "done for" and that he "d[id]n't have a prayer at trial." He said he was scared and depressed, knowing he was pleading guilty "with no plea bargaining whatsoever." Counsel advised him that a guilty plea would improve his chances of a favorable verdict at the penalty phase. He agreed to plead guilty and signed the plea form. He "was in a haze" and did not "know what was being said." He stated that he responded to the court's questions mechanically and could not remember details of the proceeding. He said he was "trying to keep from falling out of [the] chair" because he was so drunk. His only concern was getting out of the courtroom. He testified that he would not have pleaded guilty if he had not been intoxicated.

Defendant also presented the testimony of Dr. H. Westley Clark, who discussed the interaction between alcohol and the medications defendant was taking. Dr. Clark opined that the combination of alcohol and medications that defendant claimed to have consumed could "possibl[y]" have impaired his judgment on the morning of the guilty plea.

The prosecution presented the testimony of Dr. Richard Hayward, a psychologist who monitored defendant's response to medication. Dr. Hayward testified that he observed defendant the day before he changed his plea and determined that the medication, which defendant had then been taking for a few weeks, was not causing any disordered thinking or confusion. The prosecution also presented the testimony of Dr. Randall Clint Baselt, a forensic toxicologist, and Dr. Sayed Hamed, the psychiatrist who prescribed defendant's medication. These witnesses opined that the sedative effect of defendant's medications would have worn off by the time defendant entered his guilty plea. They also testified that defendant would have had visible signs of intoxication if he had consumed the amounts he claimed. Finally, Dr. Hamed reviewed the transcript of defendant's guilty plea and found no indication of impairment.

The prosecution also presented the testimony of sheriff's deputies, who stated that defendant did not seem intoxicated at all when they transported him to court the morning he changed his plea. These deputies were observing defendant closely because of the significance of his change of plea.

The court denied defendant's motion to withdraw his guilty plea and his admissions. The court disbelieved defendant, who obviously had an interest

in exaggerating the extent of his intoxication, concluding that defendant had in fact consumed less alcohol than he claimed, if any. The court stressed that it had observed defendant carefully the morning he changed his plea and that defendant showed no signs at that time of intoxication. The court found defendant had not met his burden of proving by clear and convincing evidence that he entered his plea unknowingly. (*People* v. *Wharton* (1991) 53 Cal.3d 522, 585 [280 Cal.Rptr. 631, 809 P.2d 290]; *People* v. *Cruz* (1974) 12 Cal.3d 562, 566 [116 Cal.Rptr. 242, 526 P.2d 250].)

 A decision to deny a motion to withdraw a guilty plea " 'rests in the sound discretion of the trial court' " and is final unless the defendant can show a clear abuse of that discretion. (*In re Brown* (1973) 9 Cal.3d 679, 685 [108 Cal.Rptr. 801, 511 P.2d 1153], quoting *People* v. *Francis* (1954) 42 Cal.2d 335, 338 [267 P.2d 8].) Moreover, a reviewing court must adopt the trial court's factual findings if substantial evidence supports them. (*People* v. *Quesada* (1991) 230 Cal.App.3d 525, 533 [281 Cal.Rptr. 426].) Here, substantial evidence, including the trial court's own observations of defendant, supports the court's factual determination that defendant was not intoxicated at the time he entered his guilty plea and that his plea was knowing, intelligent, and voluntary. Because the jury had returned a verdict of death, defendant had a strong incentive to exaggerate his intoxication. Defendant's testimony was inherently implausible. He stated twice that he was so drunk he was falling out of his chair, but other witnesses observed no signs of intoxication.

Defendant asserts his counsel knew he was taking medication, and he argues they should have reported this fact to the court at the time of the guilty plea, but defendant points to no evidence that supports his assertion. Defendant also argues that he *implicitly* moved to withdraw his plea on the basis of ineffective assistance of counsel. In this regard, defendant notes that a new attorney handled his motion to withdraw the plea, though his usual attorneys remained counsel of record. Use of a new attorney to argue a motion does not, by itself, establish a claim of ineffective assistance of counsel. Moreover, as we discussed above, defendant has not shown that his counsel were ineffective. Accepting as true defendant's testimony that counsel told him he had little chance for an acquittal and that a guilty plea might improve his chances at the penalty phase, this advice was reasonable in light of the evidence. Because of defendant's guilty plea and admissions, the jury did not see many of the notes defendant wrote to Szymkiewicz describing the details of his crimes, and defense counsel were also able to use the plea to defendant's advantage during argument at the penalty phase. We find no merit to defendant's assertion that his counsel would have abandoned him if required to defend a guilt phase trial.

The trial court did not abuse its discretion when it denied defendant's motion to withdraw his guilty plea and his admissions.

### E. *Constitutionality of California's Death Penalty Law*

■ Defendant raises various constitutional contentions that we have previously rejected. We adhere to our prior decisions. First, the death penalty is not cruel and unusual punishment in violation of the Eighth Amendment to the federal Constitution (*Gregg* v. *Georgia* (1976) 428 U.S. 153, 169 [96 S.Ct. 2909, 2923, 49 L.Ed.2d 859] (lead opn. of Stewart, Powell, and Stevens, JJ.); see also *Tuilaepa* v. *California* (1994) 512 U.S. 967, 980 [114 S.Ct. 2630, 2639, 129 L.Ed.2d 750] [affirming death sentences in cases involving California law]) or article I, section 17 of the California Constitution (*People* v. *Frierson* (1979) 25 Cal.3d 142, 186 [158 Cal.Rptr. 281, 599 P.2d 587]). Justice Blackmun's dissent from the high court's denial of certiorari in *Callins* v. *Collins* (1994) 510 U.S. 1141, 1143 [114 S.Ct. 1127, 1128-1129,127 L.Ed.2d 435] does not convince us otherwise. Second, California's homicide and death penalty laws sufficiently narrow the class of homicide offenders eligible for the death penalty to satisfy the federal Constitution, and we decline to construe the California Constitution differently from the federal Constitution on this point. (*People* v. *Carpenter*, *supra*, 15 Cal.4th at pp. 419-420; *People* v. *Crittenden*, *supra*, 9 Cal.4th at pp. 154-156.) Third, the use of lethal gas to impose death is not " ' "a ground for reversal of the judgment of death. It bears solely on the legality of the execution of the sentence and not on the validity of the sentence itself." ' [Citations.]" (*People* v. *Samayoa* (1997) 15 Cal.4th 795, 864 [64 Cal.Rptr.2d 400, 938 P.2d 2]; cf. *People* v. *Daugherty* (1953) 40 Cal.2d 876, 896 [256 P.2d 911].) Moreover, defendant can at his option elect death by lethal injection (§ 3604), and he does not assert that lethal injection is an unconstitutional method of imposing death. Fourth, the failure of California law to designate which of the factors in section 190.3 are mitigating and which are aggravating does not violate the state or federal Constitution. (*People* v. *Carpenter*, *supra*, 15 Cal.4th at p. 420; *People* v. *Montiel* (1993) 5 Cal.4th 877, 944-945 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; see also *Tuilaepa* v. *California*, *supra*, 512 U.S. at p. 979 [114 S.Ct. at p. 2638] ["A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision."].) Fifth, neither the federal nor the state Constitution requires the jury to agree unanimously as to aggravating factors, or to find beyond a reasonable doubt that aggravating factors exist, that they outweigh mitigating factors, or that death is the appropriate sentence. (*People* v. *Carpenter*, *supra*, 15 Cal.4th at p. 421; *People* v. *Osband* (1996) 13 Cal.4th 622, 709-710 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *People* v.

*Bacigalupo* (1991) 1 Cal.4th 103, 147 [2 Cal.Rptr.2d 335, 820 P.2d 559] [addressing unanimity]; *People* v. *Marshall* (1990) 50 Cal.3d 907, 935-936 [269 Cal.Rptr. 269, 790 P.2d 676] [addressing burden of proof].) Sixth, neither the federal nor the state Constitution requires the jury to make written findings in which it specifies the aggravating factors on which it relies. (*People* v. *Carpenter, supra,* 15 Cal.4th at p. 421; *People* v. *Medina* (1990) 51 Cal.3d 870, 909-910 [274 Cal.Rptr. 849, 799 P.2d 1282].)

■ Defendant argues that the collective effect of these asserted deficiencies in California's death penalty law violates the federal and state Constitutions. We disagree. (*People* v. *Carpenter, supra,* 15 Cal.4th at pp. 419-421.) Finally, defendant argues that, on the facts of this case, imposition of the death penalty would violate the federal and state Constitutions. Again, we disagree. Jennifer Roth testified that defendant put a bullet in a pistol, put the barrel to her head, and pulled the trigger, thus demonstrating complete indifference to human life. Arlene G. testified that defendant repeatedly sexually assaulted her just a week before he killed Wendy Cheek. Circumstantial evidence suggested defendant engaged in conduct with Cheek similar to that in which he had engaged with Arlene G. Finally, multiple stab wounds and blunt injuries on Cheek's body, as well as defendant's admission of the attempted oral copulation and torture special circumstances, all support the death sentence. On this evidence, "the death sentence is certainly not so disproportionate that it shocks the conscience [or] offends fundamental notions of human dignity." (*People* v. *Livaditis* (1992) 2 Cal.4th 759, 786 [9 Cal.Rptr.2d 72, 831 P.2d 297].)

CONCLUSION

We affirm the judgment.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Werdegar, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied February 18, 1998, and the opinion was modified to read as printed above.