Filed 11/26/13  P. v. Baez CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>GUMARO BAEZ,<br><br>        Defendant and Appellant. | A134974<br><br>(Alameda County<br>Super. Ct. No. 165542) |

In this case, defendant was convicted of two murders and attempted murder of two additional victims.  He raises several issues on appeal, primarily a claim of *Massiah*[1] error based on police contacts with a witness.  He also challenges the sufficiency of the evidence on a conviction for attempting to dissuade a witness, and the appropriateness of a fine under former section 1202.45 of the Penal Code.  On these issues, we reject his claims and affirm the convictions.  We do agree to modify the commitment to reflect the trial court's sentence.

**STATEMENT OF THE CASE**

The District Attorney of Alameda County charged defendant in an information filed on March 7, 2011, with several serious felonies.  Counts one, two and three each alleged a charge of murder (count one, the murder of Terrance Brown on Feb. 2, 2008; count two, the murder of Melissa Jackson on Feb. 3, 2008; and count three, the murder of Dominique Hooper on Feb. 3, 2008; Pen. Code,[2] § 187, subd. (a)); count four alleged the

---

[1] *Massiah v. United States* (1964) 377 U.S. 201 (*Massiah*).

[2] All statutory references are to the Penal Code unless otherwise indicated.

attempted premeditated murder of Isaac Johnson (§§ 187, subd. (a); 664); count five the attempted premeditated murder of Devonne Hayward (§§ 187, subd. (a), 664); and count six, attempting to dissuade a witness (§ 136.1, subd. (a)(2)). The information alleged as to count one, defendant was armed with a firearm (§ 12022, subd. (a)(1)) and as to counts two through five, personal use and discharge of a firearm causing great bodily injury (§§ 12022.5, subd. (a), 12022.7, subd. (a), 12022.53, subds. (b)–(d) & (g)). The information also alleged special circumstances as to counts two and three in murdering a witness to a crime (§ 190.2, subd. (a)(10)), murder by lying in wait (§ 190.2, subd. (a)(15)), and committing multiple murders (§ 190.2, subd. (a)(3)).

On November 8, 2011, the jury found defendant not guilty of count one, and guilty of the remaining five counts. They found true the allegations charged in the information.

On February 27, 2012, the trial court at sentencing declared the evidence "overwhelming" and the murders especially "heartless." The court sentenced defendant to two consecutive life terms without the possibility of parole on counts two and three as well as a consecutive term of 100 years to life for the firearm enhancements in counts two through five. Additionally, the court imposed an aggregate term for the remaining counts, to run concurrent with the sentence imposed on count two.

Defendant filed his notice of appeal on March 1, 2012, in timely fashion.

## STATEMENT OF FACTS

On February 3, 2008, Isaac "Ike" Johnson and a friend Devonne "Von" Hayward were watching the Super Bowl at the home of Hayward's brother, Rudy. They smoked marijuana cigarettes during the game. After the game, Hayward and Johnson drove Hayward's Chevrolet van around East Oakland. During this time Hayward saw defendant, a friend, along with Devashawn "DVD" Walker. DVD is Black and defendant Hispanic. Hayward gave the two men a ride in the van.

This date was the one-year anniversary of the death of defendant's brother, Adiel "Dilio" Meza, who had been shot by a police officer. Hayward and Johnson were friends of Dilio and each had a tattoo stating "rest in peace, Dilio." However, Hayward learned that defendant suspected he was responsible for the death of Dilio.

2

Upon entering the van, defendant sat directly behind Hayward, the driver, and Walker was behind passenger Johnson. The group drove to San Leandro to pick up teenagers Melissa Jackson and Dominique Hooper. The girls, who were cousins, sat on the rear bench of the vehicle. The plan was to drop the girls off at a music studio in Oakland.

Eventually, Hayward stopped the van on Havenscourt, near East 14th Street in Oakland. As he prepared to drive away, shots were fired from inside the van. Johnson indicated nothing really took place before the shooting. There had been no angry words. Johnson was hit first by bullets. Johnson believed the bullets came diagonally from the left rear of his position. This was the location of defendant in the van. Johnson believed defendant was the shooter because of the angle at which he was hit, and because he was not shot in the back of the head directly. Johnson was hit in the left side of his neck and left shoulder at the top of his arm. In an effort to escape, Johnson jumped out of the moving van, sustaining a broken arm in the process. Once outside the vehicle, Johnson heard more shots in the van.

It seems defendant fired at Hayward next. Hayward was hit in the back of the neck, on the left side. Once hit, Hayward was unable to move his arms or legs. He was subsequently put on basic life support by medics at the scene. Defendant then shot Dominique Hooper in the chest and Melissa Jackson numerous times. In fact, she sustained 15 separate wounds. One entered her ear and exited her upper lip. While defendant did the shooting, Walker took control of the van and headed toward the area where defendant and Walker lived. The van crashed into a parked car at Outlook Avenue and 65th Avenue.

A witness, Jonathan Clancy-Tone, heard the crash. Clancy-Tone saw an Hispanic male, later identified as defendant, standing by the van, close to a streetlight. The witness heard defendant yelling at Walker, "You crashed the car." Clancy-Tone asked Walker if he needed assistance as the latter was standing outside the driver's side of the van. Both defendant and Walker ran from the scene toward Seminary, near each man's home.

3

Looking inside the van, Clancy-Tone saw three people. Hayward was on the floorboard between the driver's and front passenger's seats, feet tangled in the pedals of the van. The body of Melissa was on top of Hayward's left arm. Dominique Hooper appeared alive at the time, but she died at the scene.

Oakland homicide investigators spoke with victim Johnson at Highland Hospital. At first, Johnson stated he did not know the persons picked up by Hayward in the van. At the preliminary hearing, Johnson did not identify defendant as the shooter in the van.

Later, however, Johnson did state defendant was the man behind Hayward and that Walker was the person who sat behind Johnson. During these meetings, Johnson expressed the fear he had about disclosing the identity of defendant and possible retaliation he might suffer. Sobbing, he indicated a fear his life would be on the line for talking. At the trial, Johnson indicated the talk on the street was that "something might happen to me, something might happen to my family." Even at the preliminary hearing, Johnson indicated this fear prevented him from initially telling the entire truth to the police.

At first, homicide personnel could not speak with Hayward because of his medical condition. He had tubes down his throat and was hospitalized for three or four weeks before being released to a rehabilitation center. When released, he needed a wheelchair and then a walker to move about. Eventually police obtained a statement from Hayward. At the trial, Hayward still had not recovered fully from his wounds. His left leg and arm were limited because of his wounds. He had to wear a brace and was not able to work. Hayward testified at trial he did not know who shot him, recalling nothing about the incident in the van. However, the prosecutor then played audiotapes of Hayward's conversations with police inspectors for the jury. Information provided by Hayward during these taped police interviews was his personal recall. In the tapes, Hayward stated that Johnson was the first person shot by defendant. After that, defendant, directly behind Hayward, shot him. The angle of his injuries supported his opinion, since the bullet entered the left side of his neck.

4

The van itself was the home of considerable ballistic evidence, including cartridge cases, fired bullets and jacket pieces. Firearms expert Mark Bennett concluded the bullets and casings were each fired by the same nine-millimeter Luger weapon. He also concluded the same weapon was used to kill Terrance Brown approximately 48 hours before the shooting in the van.

Defendant was arrested by police on February 6, 2008. While conducting a search of his home, police found several items of ammunition, including the type used in the shooting incidents, namely Remington and Winchester nine-millimeter Luger ammunition. At the Terrance Brown homicide scene, "RIP Dillio" and "6400" were written in the condensation on the hood of a vehicle. A group that dealt narcotics and committed other crimes on the 6400 block of MacArthur in Oakland was known as "6400." Terrance Brown was the half-brother of a lieutenant in the Oakland Police Department.

A beanie was found at the scene of the Brown homicide. DNA analysis linked the beanie to Walker. The probability of a random DNA match between the beanie DNA and Walker was one in quadrillions.

Danny McNary was arrested on May 25, 2009. He was 22 at the time and arrested for robbery. He was booked into Santa Rita Jail. Importantly, he had known defendant since he was six years old and the two were close friends. McNary also knew Dilio and another brother of defendant, Javier (Javi), who was also in custody at this time. While in custody, McNary received a jailhouse letter, also known as a "kite," from defendant. Defendant wanted to know if McNary wanted some food. Passing of kites among inmates is done by other inmates, acting as custodians.

At trial, McNary identified People's exhibit No. 53B as the initial kite he got from defendant. He did not recall if he advised police about this letter.

McNary did recall providing Sergeant Cruz with a second kite in an envelope. At trial, the witness admitted he wrote this kite himself, and not defendant. McNary testified Sergeant Cruz told him what facts to put in this second transmittal. At the preliminary hearing, McNary testified defendant sent this kite labeled exhibit No. 4. Of course,

5

McNary testified he told police and the prosecutor he feared for his safety after turning over the kites.

McNary related he was in custody on the day of the van shooting. He did not see any police reports on the shooting incident regarding defendant's case or Dilio's shooting. He did not know the identity of the officer who shot Dilio. Audiotapes of his interview with the police were played to the jury as exhibits Nos. 47A, 48A, and 49A. Transcripts were provided but not admitted.

The tapes along with the testimony of Sergeant Cruz contradicted the testimony of McNary at trial. This evidence showed that on May 26, 2009, the witness contacted homicide officers and suggested he had information concerning defendant's case. Sergeants Cruz and Van Sloten visited McNary on May 26, 27, and June 2, 2009. Cruz testified he has a policy when interviewing witnesses such as McNary not to disclose any details of a case, and he specifically refrained from such disclosures with this witness.

During the interview of May 27, McNary told Cruz he spoke with others and learned defendant committed the murders in the van as revenge for the death of his brother Dilio. Defendant believed Hayward was responsible for the death because he did not give Dilio a ride home the night he died. McNary said he learned defendant shot Hayward, Johnson, and the two girls. The two girls were killed to avoid having witnesses. McNary also stated that Derek "Little D" Powell told him that defendant was in "D pod" next to Powell. At the time, McNary was in "C pod" and eventually got moved to "A pod" when he received his first kite from defendant.

The first kite McNary got from defendant stated: "D-Ray. What's up Bra? I just found out you in A pod. I'm gonna send you some food. Write me back right now Bra and tell me what cell you in so I can tell the pod worker to send it to you. Bra Bra. Shit, You know (Rudy) over here. That nigga hella scary. When he seen me it was like seein' a ghost. I woulda got him, but I'm gonna use him to get to Von. Feel me? I'm trying to get out. Pumpin' fear in these niggas' hearts. This nigga know I shot his partner and scared fuck. This nigga scared fuck. Fuck this nigga though. What you in here for Bra

6

Bra? Try to get over here with Lil D and me. Shit. Hopefully, Lil D go home tomorrow. Love you Bra Bra."

McNary indicated that Hayward is referred to as "Von" on the street, and that Lil D is Derek Powell. Mc Nary also stated that Rudy is Hayward's brother. Saying Rudy is "scary" means that Rudy is afraid of defendant.

Cruz then asked McNary if defendant expected him to respond when he told McNary to write him back. McNary believed defendant did want a reply by the witness. Cruz then advised McNary that if he responded, he should not ask any questions regarding this case. "[D]o whatever normal activity . . . that you would normally do." If McNary learned of any further retaliation to those outside, he needed to alert Cruz.

Based on the disclosures by McNary concerning retaliation, Cruz obtained a search warrant for the cells of Derek Powell and defendant, which were served on June 2, 2009.

While executing the warrants at the jail, an officer alerted Cruz that McNary had received another kite from defendant. In a tape presented at trial, McNary told Cruz about the contents of the second kite: "Bra what's good? Yeah, though you could see it all in Tube's eyes, I ain't gonna get nothin' out of it if I get down with him. All I can do is have him get to Von or somethin' but shit, Bra, cuzzo had that comin' to him that night. . . . DVD, Mac and me walkin' to the store right? We see cuzzo in the van. Mac like, 'Let me see the thing.' So I hand him the thing. Mac gonna shoot in the air. Bra so I got hella mad so later, I see cuzzo. It's me and DVD. I wave him down. I play it cool like. 'Bra, what's up? Let's get a bottle.' So we bounced in so I'm like, my first chance, I'm on him. This nigga bounced on the way way. Next thing I know, two bitches bounce in so I'm like, 'Fuck.' So he ridein' and this nigga parked on Havenscourt just out of the blue so then I say, 'Bra, why big Bra didn't get home that night?' This exactly what he told me. 'I don't know. The nigga was high.' He ain't give a fuck so Ike started laughing at that. So then I look at DVD, right? I give him that look and the next thing you know, Von catch one through the neck. God was with him. Like as soon as the trigger was getting squeezed he jerked up to—at that moment to cut on the van and soon

7

as I thought he was dead, everybody had to go. Bra, Ike catch one to the side of his neck. Like soon as the bullet hit him, he fell out the van. He knew that shit was comin'. After that, mother fuckers had to make sure the bitches was gone. By the time they stop screamin', the bullets ran out. The whole time DVD was driving. That nigga was nervous. He drivin' hella dumb so these niggas slap on 65th so we bounce out and cut. I thought Von was dead. As soon as he got shot, his body was lifeless but if—if the broads were still alive, it would've really been over. Everybody know you can't leave witnesses so the outcome was Von and Ike stayed alive. Now both of them niggas givin' statements on me. They left hella shit out but they say I did it. Bra if them niggas get on the stand, its ugly. I don't think I'm ever gettin' out. Shit, they talkin' about the death penalty."

McNary disclosed to Cruz the above kite came in a sealed envelope. He gave Cruz this item along with the kite. Subsequent DNA analysis of the saliva on the envelope matched defendant's DNA, with a probability ratio of one in one sextillion.

The defense played a tape of an interview of McNary with its investigator made on September 20, 2011, wherein McNary acknowledged he made up a lot of information in the kites to help him receive a better deal from the district attorney. He acknowledged he wrote the second kite and not defendant; the second kite was passed to Cruz on June 2, 2009. McNary met with the defense investigator to clean up what he did.

During the trial, the prosecution confronted McNary regarding his statements to the defense investigator indicating he was the author of the June 2 kite. The district attorney played a tape made by Inspector Harry Hu and McNary after McNary acknowledged at his October 13, 2011 hearing that he, not defendant, created the second kite. McNary did not know his conversation with Hu was being recorded. In it, McNary indicated he was making the retractions for the good of his family, especially his son. He was concerned that someone would confront him or his child on the streets and told Hu, "I don't know where it's gonna to come from. . . . I'm looking out for my son." McNary described the brother of defendant, Javi, as "the type of person where if I got into it with his brother [(defendant)], and he can't get me, he's gonna get my family." Inspector Hu

8

then asks McNary, "So what you're doing is just protecting yourself. . . . Protecting your son and your family." And McNary replies, "Yeah."

The jury was allowed to compare the handwriting of defendant and McNary along with the two kites received in evidence. Sergeant Cruz was allowed to state the handwriting in the two kites were similar and each kite contained similar details and phrases.

Besides the two kites described above, the prosecution introduced papers found during a search of Derek Powell's cell. A birthday card was found containing a sheet of paper with "BGL-747 Gumaro Baez" (defendant's jail number) and two other letters. One of the letters was addressed to "Randa." Miranda Smith was the girlfriend of defendant. In the first letter, defendant wrote: "Randa this the get down. They charged DVD with the shit I'm charged with, and another murder. They found his hat at that other murder scene. The reason they linked the murders is because ballistic tests show the same gun was use at both the scenes. Feel me. The only reason I'm still in here is because Von & Ike statements, and I'm not positive DVD gave a statement on me. I thought he was the confidential informant. It really don't matter if he saying I did it cuz if he is, it's go look like he trying to save his self. Baby if Von & Ike don't come to court I'm go be home soon. . . . Without their testimony they ain't got shit on me." He goes on to point out it all depends on Von and Ike not taking the stand.

A second letter in the card indicated that Miranda should help create a false alibi for defendant during the weekend Brown was killed and the van shootings took place. In the first part of this letter, defendant advises "Baby" about the alibi. "Baby this just in case OK. My lawyer said you ain't gone have to because the case is weak if the witnesses don't show up, witch they not. (Ike & Von). But it's always good to stay prepared. If they still try to ask my whereabouts this matches the timing with you, Jonique, me & Bitch ass. . . . Tell Jonique that too blood. Like I said I don't think ya gone have to but we got to stay two steps ahead of these crackers."

Defendant then proceeded to dictate the alibi for the weekend crimes. "I was with my Husband all Friday, Saturday, Sunday. I came over Friday after school. Only time

9

he'll drop me off to get dress.  He dropped me off Saturday morning, and Sunday morning, and soon as I finish getting dressed he'll come pick me up.  I recall Sunday we was drinking (me, Jonique and his friends . . . DVD, Kyn, Derek, Mac, Rob).  My sister came and picked me & Jonique up at around 11–11:30 because I had school in the morning.  She told me she was go come get me at 11 no matter what.  So she did.  So when I got home I thought if I asked my husband to come spend the night.  I text message his phone a couple times.  He said he texted me back but I never receive his message.  But I remember like around 1 or something he knocked on my door.  And he spent the night.  I don't remember who dropped him off.  I didn't ask I was with him all Monday, Tuesday, and Wednesday . . . . [¶] PS Babe try to remember the best you can what you told the police and don't try switching it up.  Member they recorded you.  Study it.  It like a test.  Matter of fact harder.  Just in case OK Randa.  Love you.  Memorize that time 11–11:30."

The prosecution introduced phone records between Miranda Smith and defendant showing that she repeatedly called defendant 20 minutes before the van murders.  Her unanswered calls to defendant were made from her home in Alameda.

The defense presented no witnesses.  Instead, counsel contended Walker shot all the victims in the two crime scenes, and defendant had no responsibility for any shootings.  Defendant was the "victim" of growing up on Oakland streets.  He argued McNary authored both of the kites he provided police.[3]

## I.  THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN RECEIVING THE TWO JAILHOUSE LETTERS DESCRIBED IN THE TESTIMONY OF McNARY

The thrust of defendant's case hinges on his claim the court committed reversible error when it allowed two jailhouse letters in evidence.  He argues the police inspectors

---

[3] On July 27, 2010, Devashawn Walker pleaded no contest to one count of voluntary manslaughter, a lesser included offense to the murder of Melissa Jackson (count two).  On October 15, 2010, Walker was sentenced to a term of 11 years in state prison.  The district attorney did not allege Walker personally and intentionally discharged a firearm in the various murders and attempted murders.

violated the principles developed in *Massiah, supra*, 377 U.S. 201, when they involved McNary as an informant.[4]

Unfortunately for defendant, he acknowledges Sergeant Cruz gave several admonishments and cautions to McNary regarding contact with defendant. In his opening brief, he indicates Cruz told McNary not to correspond with defendant concerning the case. Cruz told McNary not to ask any questions about the case. He also notes McNary was cooperating because he had an implied promise from Cruz the officer would help him in his robbery case by contacting the district attorney and asking for consideration for his assistance.

In no way can defendant's *Massiah* challenge preclude the jury's consideration of the letters found in the search of Derek Powell's cell and the incriminating statements made by defendant. The seizure and admissibility of the materials is not challenged by defendant in this appeal.

Regarding the McNary papers, defendant contends McNary was acting as a police informant violating defendant's Sixth Amendment right to counsel. Counsel argues Cruz "encouraged" McNary to obtain further messages from defendant. The defense maintains reversal is necessary because defendant's incriminating remarks in the letters dealing with his responsibility for the homicides was a central feature of the prosecution's case. Defendant contends it cannot be shown beyond a reasonable doubt the error did not contribute to the verdict.

We find the contention without merit. There is substantial evidence to support the trial court's determination there was no *Massiah* violation.

*Massiah* holds that once adversarial criminal proceedings have been started against the accused, his Sixth Amendment right to counsel is violated if a state agent *deliberately* elicits incriminating statements without counsel present. (*Massiah, supra,*

---

[4] It should be noted that at the preliminary hearing, defense counsel believed the May 26, 2009 statements by McNary to Cruz were "volunteered." The defense indicated he was not maintaining McNary was acting as a government agent when he received the first kite from defendant.

11

377 U.S. 201, 206–207; *In re Neely* (1993) 6 Cal.4th 901, 915.)  However, defendant must establish the informant was acting as a government agent and the informant deliberately elicited incriminating statements.  (*Kuhlmann v. Wilson* (1986) 477 U.S. 436, 459; *United States v. Henry* (1980) 447 U.S. 264, 270.)  A person acts as a government "agent" when he or she is " 'under the direction of the government pursuant to a *preexisting arrangement,* with the expectation of some resulting benefit or advantage.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1246–1249 (*Fairbank*), italics added; *In re Neely,* at p. 915.)  However, when the informant " 'acts on his own initiative,' " even if he personally questions the accused, " 'the government may not be said to have deliberately elicited the statements.' " (*Fairbank*, at p. 1247; see also *In re Neely,* at p. 915; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1240.)

Evidence of a preexisting arrangement with the government does not have to be explicit or formal in nature.  It can be inferred from the evidence where the parties behave in a manner demonstrating there is a compact between them, following a particular course of behavior, over a period of time.  (*In re Neely, supra,* 6 Cal.4th at p. 915.)  Prior evidence of a relationship can support this fact by implication.  However, more than a cooperative relationship is needed to make an informant a government agent with regard to a particular defendant.  (*United States v. Whitten* (2d Cir. 2010) 610 F.3d 168, 193–194.)  An officer's interest in a meeting between a defendant and another inmate alone does not amount to a directive adequate to label an inmate as an agent of the government.  (*Ibid.*)

After the defendant establishes a preexisting arrangement, he or she must then demonstrate the police and the informant engaged in some conduct, beyond simply reading or listening to the defendant's voluntary comments.  They had to have engaged in behavior deliberately designed to elicit incriminating remarks.  (*Kuhlmann v. Wilson, supra,* 436 U.S. at p. 459; *Fairbank, supra,* 16 Cal.4th at pp. 1246–1249.)  Yet, actual interrogation on the part of the informant is not required to satisfy this prong of the *Massiah* analysis.  The defendant's right under the Sixth Amendment in the *Massiah* analysis is transgressed if the government informant stimulates or actively engages in

conversation with the defendant concerning the offense charged. (*In re Neely, supra,* 6 Cal.4th at pp. 915–916.) Decisions invoking *Massiah* prohibit clandestine interrogation by techniques that are the legal equivalent of *direct* police questioning. (*Kuhlmann*, at pp. 456–461.) Therefore the permissive and valid use of a jail informant's testimony at trial becomes a factual question which is reviewed on appeal by a deferential standard. (*Fairbank,* at pp. 1247–1249; *People v. Memro* (1995) 11 Cal.4th 786, 828.) If substantial evidence supports the trial court's ruling here, we will not reverse it.

The trial court conducted the *Massiah* hearing on October 12, 2011. McNary testified he was arrested for robbery on May 25, 2009, and housed in Santa Rita Jail. He learned from inmates that defendant and Derek Powell, the brother of McNary's girlfriend, were housed at the facility. Within a day of his incarceration at Santa Rita, McNary got a kite from defendant. McNary knew it was from defendant because he was familiar with the handwriting. He responded to defendant's kite by telling him he wanted some food.

During the hearing, McNary refuted the tape recording prepared by the police by stating, for the first time, he wrote the second kite, not defendant. The witness acknowledged he had testified inconsistently at the preliminary hearing, that this was different from what he had regularly told Sergeant Cruz, and that his current testimony was contrary to remarks he gave the prosecution shortly before the *Massiah* hearing started.

During the examination of McNary, the prosecutor asked about particular detailed facts in the second kite which McNary claimed he had authored. McNary was not able to provide particular details described in the kite such as the officer who shot defendant's brother, specifics on the victims, and the actual occurrence of the van shooting. These matters were detailed in the second kite. McNary did affirm his first contact with Sergeant Cruz was when the officer saw him on May 26, 2009, around 8:15 p.m. in the jail. Mc Nary indicated Cruz advised him to try to continue contact with defendant, but also indicated the officer had concern for McNary's safety in the jail. The prosecutor was concerned regarding the witness's safety and moved him to a neighboring county jail for

13

protection. After McNary testified at the preliminary hearing, he was confronted by associates of defendant and told he was a "snitch."

On cross-examination, McNary indicated when he initially spoke with Cruz and his partner, the officers only asked if he could provide information on any matter, not the specific case involving defendant. McNary testified he was advised he could have a deal that would get him out of custody before his son was born if he cooperated. Based on the suggestion of release, McNary decided to personally draft the second kite and place it in an envelope he obtained from defendant.

Inspector Hu met with McNary along with the prosecutor on several instances before the hearing on October 12, 2011. Hu found McNary was nervous and very worried about personal safety. On the morning of the hearing, McNary told Hu and the district attorney he did not write either kite. He also indicated he was told not to seek more information from defendant.

Sergeant Cruz testified he began investigation of the van shootings on February 3, 2008. On May 26, 2009, he was advised that Hayward police believed McNary would have some information on defendant's involvement in the case. Based on this tip, Cruz and his partner visited McNary at the jail. Cruz's interview with McNary on May 26 and the following day were taped. Each was played during the trial. Additionally, the interview between McNary and the defense investigator was also played to the jury.

At the initial meeting on May 26, 2009, Cruz obtained the kite from McNary. McNary advised Cruz he received it from defendant. Based on the note, Cruz became worried about the witness's safety. He obtained search warrants for the cells of defendant and Derek Powell. Cruz testified he did not ask McNary to obtain more information regarding defendant and his role in the crimes. He did not promise McNary any leniency for his assistance. He did advise McNary he would tell the prosecutor in the pending robbery case that McNary had been cooperative and should receive consideration. He never had or suggested McNary be wired and meet defendant or be placed in a cell closer to the accused. Essentially, Cruz advised the witness to accept any

14

kites transmitted by defendant but not to send notes himself to defendant so as to trigger additional kites.

Cruz also testified he had no contact with McNary before May 2009, nor had any other officer on the force had dealings with him. After May 27, the next meeting between Cruz and McNary took place on June 2, 2009. This visit was triggered after Officer Gutierrez told Cruz McNary wished to meet. At this meeting, McNary provided the second kite, four pages in length. This second kite contained details of the shooting that were not publicized in the media. Included in the kite were such facts as the hat with DNA found at the Terrance Brown scene, how Hayward was wounded, and the name of the officer who shot defendant's brother on February 3, 2007.

At the conclusion of testimony, the trial court found it "simply was not the case" that "Danny McNary . . . 'was induced by law enforcement officers to attempt to obtain incriminating statements . . . from the defendant,' " or that " 'McNary was acting as an agent of law enforcement.' " McNary initiated the contact with police. "Sergeant Cruz never in any way instructed or provided Mr. McNary with any direction about additional ways or means by which to solicit additional incriminating information from Mr. Baez about the pending case." Also, the trial court found the claim that McNary wrote the second kite was not credible. Indeed, while Cruz did advise McNary not to avoid defendant since they were in the same jail facility, the officer did not involve himself in moving McNary to a location more accessible to defendant nor did he provide any instruction to McNary on how to elicit further incriminating responses from defendant. On the authorship of the second and detailed kite, the court observed: "Simply put, to think that Mr. McNary would be able to put together a letter with that much detail from information that he gleaned piecemeal from the neighborhood is simply unbelievable. [¶] . . . [¶] . . . So, the claim that [McNary] wrote that letter is simply unbelievable in the court's eyes."

The court observed that McNary "hoped" to receive some consideration from Cruz for providing the kites. But that aspiration on the part of McNary did not mean Cruz promised a deal for more information. "[H]ope is not synonymous with an overt promise

15

or an overt expectation that some benefit will be derived by passing on any additional information, particularly in the context of the information that Sergeant Cruz was looking for. . . . [¶] . . . [T]he fact that McNary thought that some benefit could be derived does not necessarily mean that there was an overt promise made that would make this Court find there was an overt incentive. It seems to the Court that the ball at that point was squarely in Mr. McNary's court at that time, and that he did nothing to intentionally or deliberately elicit additional information from the defendant."

In the *Massiah* hearing defendant had to demonstrate the prisoner McNary was acting at the instigation of police. He needed to show factually either this conduct was generated by a police promise to assist in McNary's robbery case or that Cruz actively promoted and encouraged contact with defendant. However, the record here shows no preexisting relationship between police and McNary. Before the day Cruz met McNary and received the first kite, the officer had never met or interviewed him. To Cruz, McNary had never been an informant for any law enforcement person. Cruz testified he never made a promise of leniency for additional information against defendant. He simply advised McNary he would contact the prosecutor in the robbery case and advise that person what McNary had done.

The hope of receiving consideration by an informant does not create an agency relationship. A *Massiah* finding needs more because it is understood that informants hope for a benefit in exchange for providing information to police. (*Fairbank, supra,* 16 Cal.4th at p. 1248.) Even the receipt of favorable treatment does not alone create an agency relationship. (*People v. Williams* (1997) 16 Cal.4th 153, 204.) The appreciation by an informant that there is a market for information does not make a participant in that process a government agent. (*United States v. York* (7th Cir. 1991) 933 F.2d 1343, 1357.)

It should be noted the defense at trial presented evidence McNary, not defendant, was the author of the second kite and arguably created the both kites. The defense presented McNary's admission he wrote the kite and lied at the preliminary hearing and during taped interviews with police. Defendant also presented the defense investigator

16

tape where McNary affirmed he made up the evidence. If such was believed, then there would be no *Massiah* issue because it was McNary and not defendant creating the false information.

The facts here are similar to those in *Fairbank, supra*, 16 Cal.4th 1223. In that case, a prisoner named Szymkiewicz contacted police regarding notes he received from the defendant. Szymkiewicz was awaiting sentence and wanted to obtain favorable treatment in this regard. In his meeting with the police, the detectives advised the inmate they would speak with the prosecutor but made no promises. The police did not tell Szymkiewicz to attempt to obtain additional information from the defendant. The informant retained the original notes. (*Id.* at p. 1246.) While the prisoner remained in custody, the police expected he would have contact with the defendant and might obtain further information. Also, the prosecutor handling the defendant's case arranged for the sheriff not to move the defendant from the jail block where Szymkiewicz was housed, expecting more information. (*Id.* at pp. 1246–1247.) In the end, Szymkiewicz provided the police all notes and information he had obtained from the defendant, and received a lesser sentence. (*Id.* at p. 1247.)

In rejecting the *Massiah* claim, the Supreme Court determined Szymkiewicz was acting independently and law enforcement did not induce the admissions by the defendant. (*Fairbank*, *supra*, 16 Cal.4th at p. 1248.) While the informant did continue contact with the defendant, obtaining more information, and these conversations took place after meeting with police, the behavior did not make Szymkiewicz an agent of police. Even the belief and expectation by police they would obtain some tangible benefit from the jail meetings between Szymkiewicz and the defendant did not constitute a violation of *Massiah*. "[T]he police made no promises to Szymkiewicz about a possible deal, they did not direct him to obtain more information, and they did not suggest that obtaining more information would benefit him." (*Ibid.*) There is no unlawful interference with the accused's Sixth Amendment right to counsel when the jailed inmate on his own initiative engages in contact with the defendant, but not at the behest of law

17

enforcement. (*United States v. Henry* (1980) 447 U.S. 264, 270, fn. 10; *People v. Whitt* (1984) 36 Cal.3d 724, 742–743.)

It is also correct that even if the trial court erroneously admitted the second kite in evidence, this is harmless error. Isaac Johnson and Devonne Hayward provided evidence it was defendant who shot each man. The nature of the bullet wounds and their point of entry corroborated their testimony and cancelled the liability of Walker as the actual shooter. The same gun was used to kill Melissa Jackson and Dominique Hooper after defendant had shot Johnson and Hayward, in rapid fashion. The witness Clancy-Tone saw defendant chastise Walker for crashing the van after the shootings. There was *no* defense claim the first kite was authored by McNary. That kite indicates defendant wanted to go to Hayward and intimidate him about testifying. The kites found in the cell of Powell, authored by defendant, indicate defendant could beat the case if Hayward and Johnson did not testify against him: "they ain't got shit on me." Defendant detailed an alibi for his girlfriend Miranda Smith and he expected Powell, about to be released from custody, would be able to deliver it to Smith soon. This was more than enough evidence to establish, if needed, harmless error beyond a reasonable doubt.

## II. DEFENDANT'S CHALLENGE TO SUFFICIENCY OF THE EVIDENCE REGARDING DISSUADING A WITNESS IS REJECTED

Defendant challenges the sufficiency of the evidence supporting his conviction of section 136.1, subdivision (a)(2).[5] In this case, the trial court denied defendant's Evidence Code section 1118 motion on sufficiency of evidence relating to this count during the trial. There is no argument by defendant the jury was improperly instructed on the charge. We are left with a sufficiency of the evidence review.

---

[5] Section 136.1, subdivision (a)(2) states: "(a) Except as provided in subdivision (c), any person who does any of the following is guilty of a public offense and shall be punished by imprisonment in a county jail for not more than one year or in the state prison: [¶] . . . [¶] (2) Knowingly and maliciously attempts to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law."

18

In making the review, we look to the entire record of the case. We must realize it is the exclusive province of the trial judge or jury to determine the credibility of witnesses and the truth or falsity of the facts upon which that determination was made. "Thus, if the verdict is supported by substantial evidence, this court must accord due deference to the trier of fact and not substitute its evaluation of a witness's credibility for that of the fact-finder." (*People v. Barnes* (1986) 42 Cal.3d 284, 303–304.)

Under section 136.1, subdivision (a)(2), the prosecution has the obligation to prove the acts of the defendant were intended to "affect or influence a potential witness's or victim's testimony or acts . . . ." (*People v. McDaniel* (1994) 22 Cal.App.4th 278, 284.) Evidence reflecting the decision to put a plan into action with the necessary intent supports a conviction for criminal attempt, charged here. (*People v. Toledo* (2001) 26 Cal.4th 221, 230.) There is sufficient proof of the charge where the accused placed a phone call asking a third person to deliver a message to a witness that the witness should not testify against the defendant. This established sufficient proof of an attempt to dissuade a witness even though the third party did not relate the defendant's message to the witness. By soliciting the third party to convey the defendant's wishes to the victim, defendant accomplished some part of the crime. (*People v. Foster* (2007) 155 Cal.App.4th 331, 333, 335–336.)

Here, defendant wrote the first kite to McNary, and two other kites were found in the cell of Powell, each indicating defendant could avoid conviction if Hayward and Johnson did not testify against him. Powell was about to be released from custody with this information. Hearing this message alone would be "Pumpin' fear in these niggas' hearts." When defendant sent the first kite to McNary, he described his jailhouse encounter with Hayward's brother Rudy. Defendant tried to get Rudy to dissuade Hayward from testifying. "This nigga know I shot his partner . . . . This nigga scared fuck." McNary noted that Rudy told him that Hayward would not come to court because they would "rather handle somethin from the streets." Johnson told the police he was afraid to testify because he heard on the street that something would happen to him or his family. Sergeant Cruz found the kites in Powell's cell, one of which included

19

defendant's message to his girlfriend: "Baby if Von & Ike don't come to court I'm go be home soon. That's all I need to get out . . . . Without they testimony they ain't got shit on me." And defendant was in no rush to achieve this goal. "Baby the only reason I ain't rushing this is because I need to be positive. Von & Ike ain't coming to court. . . . This my life and I need to be prepared for whatever. Ten steps ahead of these mothafuckas. . . . My lawyer said without Von & Ike they ain't got no case . . . . I should be home soon." Other remarks support this theme in the kites.

Under the sufficiency of the evidence review, the jury's verdict of guilty on count six (attempted intimidation of a witness), will not be disturbed.

## III. THE COMMITMENT ORDER WILL BE CORRECTED

The Attorney General agrees the trial court ordered the nine-year term for attempted murder (count four), the two-year four-month term for attempted murder (count five), and the eight-month term for dissuading a witness (count six), to be served concurrently with count two. The abstract of judgment should be amended to reflect the court's oral pronouncement in this matter.

## IV. THE IMPOSITION OF A PAROLE REVOCATION FINE UNDER SECTION 1202.45 WAS PROPER IN THIS CASE

Finally, defendant contends the $10,000 parole revocation fine imposed by the trial court pursuant to former section 1202.45 should be stricken because he was sentenced to life without the possibility of parole. Under the circumstances, the fine was proper.

When defendant was sentenced, section 1202.45 provided: "In every case where a person is convicted of a crime and whose sentence includes a period of parole, the court shall at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4. This additional parole revocation restitution fine . . . shall be suspended unless the person's parole is revoked. Parole revocation restitution fine moneys shall be deposited in the Restitution Fund in the State Treasury." (Former § 1202.45.)

While it is correct, as argued by defendant, that when the total sentence creates no parole eligibility the fine is clearly not applicable; the fine is imposed when defendant faces an aggregate determinate term along with the life without parole indeterminate sentence. In a case involving the death penalty along with determinate terms, the California Supreme Court concluded the fine was required. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1075–1076.) Section 1202.45 requires this fine in every case where a person is convicted of a crime and whose sentence includes a period of parole. (*Brasure,* at pp. 1075–1076.) This is the case because every determinate sentence has a parole period and therefore a parole eligibility fine. (*Ibid.*) Also, defendant suffers no prejudice here because the fine only arises if he is paroled and his parole is revoked.

Since determinate sentences were imposed here, the fine was properly imposed.

## DISPOSITION

The clerk of the superior court is directed to modify the abstract of judgment to reflect oral declarations by the trial court at sentencing: the determinate sentences in counts four, five and six be served concurrently with the sentence imposed in count two. The clerk is to then forward a copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.

Otherwise, the conviction is affirmed.

_____
Dondero, J.

We concur:

_____
Margulies, Acting P. J.


_____
Sepulveda, J.*


* Retired Associate Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.